Filed 3/6/17

CERTIFIED FOR PARTIAL PUBLICATION\*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B266889 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA417564) |
| v. | |
| ENOC M. GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed in part, reversed in part, and remanded.

Patricia S. Lai, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.

---

\*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Parts II.C and II.D.

A jury convicted defendant and appellant Enoc Garcia (defendant) on two counts of assault with a firearm. The jury found defendant committed both offenses "for the benefit of, at the direction of, or in association with a[ ] criminal street gang, with a specific intent to promote, further, or assist in criminal conduct by gang members." (Pen. Code,[1] § 186.22, subd. (b).) The sole contested issue we are asked to decide is whether the jury's gang enhancement true finding is supported by sufficient evidence, and the answer to that question turns, in part, on whether there was substantial evidence the Black P-Stones gang in Los Angeles comprises two gang subsets: the City Stones (or "Bittys") and the Jungle Boys (or "Jungles").

## I. BACKGROUND

### A. *The Offense Conduct*

Throughout the day on September 20, 2013, sisters Traynisha Foster (Foster) and Cristal Velez (Velez) were involved in a series of four fights with Myailah Hopson (Hopson). All three women lived in the same apartment building on the corner of West Adams Boulevard and Montclair Street in Los Angeles. Hopson's boyfriend Shawn Jones (Jones), who was later identified at trial as a Black P-Stones gang member, also participated in each of the fights. Defendant, who was also identified at trial as a Black P-Stones gang member, was present and armed during the final fight, and he fired multiple gunshots, which hit two bystanders (the conduct that serves as the basis for both assault with a firearm convictions).

---

[1] Undesignated statutory references that follow are to the Penal Code.

2

The first fight started around 10:00 or 11:00 a.m. According to Foster, "[Hopson] was already with gang members from BPS [i.e., Black P-Stones]" outside the apartment building, and she (Hopson) called Velez a bitch. That triggered the fighting, with Hopson and Velez pulling each other's hair and punching each other. While the fight was underway, Hopson's boyfriend Jones joined in and punched Velez, pulled her hair, and put his fingers in her eyes. Foster unsuccessfully attempted to pull Jones off Velez, and the fight ended when Velez stopped fighting and walked away. Foster and Velez went back to their apartment and Velez called her boyfriend, Jermaine King (King), and asked him to come to the apartment building to pick her up.

Before King arrived, and roughly 10-30 minutes after the first fight ended, Velez and Foster left their apartment and again encountered Hopson, this time outside a nearby 99-cent store on Adams Boulevard. A second fight erupted, involving sisters Velez and Foster on one side and Hopson, Jones, and an individual Velez described as "some other girl from BPS" on the other. The fight ended when Jones pushed Velez into the street and another unidentified man stopped Jones from kicking her. But minutes later, a third fight broke out in the same general area, with Hopson and Foster trading blows. Jones again participated in the fighting, punching Foster in her back and throwing her across the ground.

During the fighting up to this point, Foster heard Jones and Hopson making what she believed to be various gang-related references. Jones was "stating his gang name, like, 'BPS,'" and saying "Blood" more than once; Foster also heard Hopson saying

"Blood."[2]  Foster specifically recalled Jones saying "Fuck her up, Blood," and she also recalled Jones and Hopson stating "they were going to call people," which scared Foster.

Beginning at approximately 1:00 p.m., Jones made calls to defendant and the two also exchanged several text messages.[3] The first call was made at 1:03 p.m., and a minute later, defendant received another call from Jones, which lasted two minutes and twenty-two seconds.  A later text message from Jones to defendant stated:  "Come.  It's Brackin, FRFR." Defendant replied, "Ima catchin the bus, Berious O!"  Then, at 1:34 p.m., Jones sent two text messages to defendant, the first of which stated, "Okay.  Shawn need to go to the ER," and the second that said, "WYA P-Stone."  Four minutes later, defendant texted messages to Jones stating "I will" and "Be there 5 minutes."  At 1:54 p.m., defendant received a message from Jones stating "Call when you on Adams."  One of Foster's friends in the apartment building later saw Jones and a person she recognized as defendant walking toward Hopson's apartment.

Velez was outside the apartment building when King, her boyfriend, arrived in response to her earlier request that he come

[2]     As the prosecution's gang expert would later testify at trial, the Black P-Stones gang is known as a "Blood" gang and its members often wear red clothing and refer to each other as "Blood."

[3]     The evidence of the calls and text messages was obtained by forensic investigation of a cell phone recovered during the police investigation of the charged crimes.  Based on that investigation, investigators formed the belief that the cell phone belonged to defendant and Jones was designated by the name "Uno" in the phone.

4

pick her up.  Velez walked back toward her apartment to get some clothes and encountered Hopson, who was standing in front of the window to her own apartment.  At that point, Hopson and Velez again began fighting—the fourth fight that day.  While the fight was in progress, Velez heard Hopson yell something to the effect of "bring that thing out that bag" to Jones, who was looking out of Hopson's apartment window.  Velez also heard Jones make a similar "get that thing out that bag" statement, apparently to someone else she could not see.

As the two women continued to fight, Velez saw Jones exiting the apartment building gate toward where she was fighting with Hopson.  Defendant, wearing a tank top, was walking behind Jones.  Meanwhile, King (Velez's boyfriend) was running from where his car was parked toward where Hopson and Velez were fighting.  Jones intervened in the fight by grabbing Velez, and King punched Jones, knocking him to the ground.  Defendant then pulled out a gun and fired multiple shots in King's direction.  King was hit by a bullet in his back, which exited through his chest (he survived), and two nearby bystanders were also hit: Erik Ross (in the back of one of his knees) and Kamila George (grazing her ankle).  One of Foster's friends who lived in the apartment building heard the gunshots and called the police at 2:21 p.m. to report the shooting.

    B.    *Defendant's Arrest and His Post-Arrest Call to Jones*

Defendant was arrested about a month after the shooting and he made a telephone call to Jones from jail.  During the phone call, Jones asked defendant what he was charged with, and defendant told him it was attempted murder.  Throughout the conversation, defendant and Jones repeatedly referred to

5

each other as "Blood." At one point, Jones told defendant, "I had—I could have did it by myself, Blood." Defendant replied, "No, Blood. Be quiet, Blood. Be quiet." After a third man joined the phone call, defendant said: "[T]hey have pictures from the camera, Blood. That nigga came to my car . . . . Hey, (Inaudible) P Stone, nigga—nigga will think it out though." Jones responded, "On Blood. I play my part—I should have never called you . . . ." Defendant replied, "Hey, Blood. Be quiet, Blood. Be quiet. They record this shit."

### C.    Gang Expert Testimony at Trial

Both the prosecution and the defense presented gang expert testimony at trial. Los Angeles Police Department Officer Carlos Guerrero, who was then assigned to the gang enforcement detail for the Department's Southwest Division, testified as the prosecution's gang expert. The defense's gang expert was Alex Alonso, a Chicano and Latino studies professor at California State University at Long Beach who researched street gangs and created a website featuring various articles on street gangs.

### 1.    Officer Guerrero's testimony

Officer Guerrero began his testimony by summarizing the sources of his knowledge and expertise concerning the Black P-Stones, or "BPS." He explained his duties in the Southwest Division included documenting, investigating, and suppressing the Black P-Stones, including what he described as two of the gang's "subsets," the Bittys and the Jungles. For seven years, Officer Guerrero had patrolled Baldwin Hills Village, which he described as an area where the Black P-Stones gang predominantly has a stronghold. He had a multitude of

consensual contacts with Black P-Stones gang members to gather intelligence about the gang and gain awareness of "what's going on in the neighborhood," including whether there were any existing or developing rivalries or feuds with other gangs. He had also worked on search warrants and arrests involving Black P-Stones gang members, consulted with other law enforcement officers concerning specific problems related to the Black P-Stones, and testified as an expert about the Black P-Stones on three prior occasions.

Significantly for purposes of this appeal, Officer Guerrero also detailed the historical development of the Black P-Stones gang. He explained Eugene "The Bull" Hairston and Jeff "The Prince" Fort founded the Black P-Stones gang in Chicago in the late 1950s. In 1969, the gang granted others in Los Angeles permission to start a "chapter" of the gang, which was known as the City Stones (and later known as the "Bittys" when the gang members substituted a "B" for the "C" in "City" because of dislike of the letter "C" associated with Crip gangs). Once the gang was up and running in Los Angeles, the members realized they "needed reinforcements in larger numbers" and one of the founders of the Los Angeles chapter recruited the Jungle Boys. According to Officer Guerrero, "[t]hose guys joined the Bittys" and the gang continued to grow over time.

On the most recent occasion when Officer Guerrero checked a law enforcement gang database covering Los Angeles County, the database catalogued over 1,100 documented Black P-Stones gang members, with over 800 members being part of the "Jungle set" and over 300 "within the Bitty[s] set." Guerrero identified the boundaries of territory claimed by the Black P-Stones and explained the Jungles and Bittys subsets controlled different

parts of that territory—the Bittys' turf being the northern part of Black P-Stones territory and the Jungles' turf being the southern part. When specifically asked to describe the relationship between "a Jungles P-Stone member versus [a] Bitty[s] P-Stone member," Officer Guerrero explained: "They are the same—same family, criminal organization. They are Black P-Stones. When they do a crime, they do it together, a Bitty or a Jungle, for the same purpose." Officer Guerrero was also asked whether the Bittys and the Jungles were "two separate individual gangs" in light of the separate geographical regions they controlled; he answered, "They are part of one—they are part of one gang, the Black P-Stones." He further explained the two subsets had "safe passage" or a "free pass" to enter the territory controlled by the other "because they are from Black P-Stones."

Based on his training and experience, and from speaking to other officers, Officer Guerrero opined the Black P-Stones' primary activities were "ADW shootings," assaults with deadly weapons, robberies, narcotics sales, pimping and prostitution, homicides, witness intimidation, and assaults on police officers. The prosecution introduced two certified court records during Officer Guerrero's testimony to establish the predicate pattern of gang crimes that must be proven for the criminal street gang enhancement alleged against defendant to be found true. The first record revealed Brandon Lamar Jones was convicted of attempted murder and robbery for conduct occurring in December 2008. From speaking to the arresting officers and detectives who investigated those crimes, Officer Guerrero knew Brandon Lamar Jones was a documented, self-admitted Black P-Stones member from the Jungles subset. The second certified court record revealed Marquis Jewel Turley was convicted of attempted

8

murder for conduct occurring in January 2011.  Officer Guerrero was personally involved in Turley's arrest and knew him to be a self-admitted Black P-Stones member from the Bittys subset.

When asked about identifiers that signal membership in the Black P-Stones gang, Officer Guerrero described clothing, tattoos, hand gestures, graffiti, and language associated with the gang.  Black P-Stones members often wear red clothing and other attire associated with sports teams using red in their uniform colors, including the Anaheim Angels.  Guerrero explained, however, that Black P-Stones members would also wear Toronto Blue Jays attire, despite the blue color associated with Crip gangs, "because they have a saying, 'from Bitty[s] to the J's.'  It's Bitty[s] all the way to the Jungles.  The Toronto Blue Jay bird, not the color blue, but the letter 'J.'"  As for tattoos, common among Black P-Stones gang members were tattoos of the letters "BPS," the number "5," the Roman numeral "X," a pyramid with bricks, and others.

Turning to the particulars of this case, Officer Guerrero opined defendant and Jones (Hopson's boyfriend) were both members of the Black P-Stones gang.  Officer Guerrero had previously encountered defendant personally, and knew him to be a self-admitted Black P-Stones member.  Guerrero's opinion that defendant was a Black P-Stones member was also partly based on his tattoos: defendant had "BPS" tattooed on his stomach, "NRK" on his back, a red number "5" on his right arm, and a red "X" on his left arm.  As to the NRK tattoo, Officer Guerrero explained it was an abbreviation for "No Respect Krew," which was a further sub-clique of the Jungles subset of the Black P-Stones gang.  As to Jones, Officer Guerrero formed the opinion that he was a Black P-Stones member based on, among other

9

things, his conversations with other officers in the Southwest Division's gang unit, performing probation compliance checks, and "documentation through [police] department resources." In addition, as to both men, Officer Guerrero had reviewed a photograph obtained from defendant's cell phone that depicted defendant together with Jones, with defendant wearing a Toronto Blue Jays hat, and Jones wearing an Anaheim Angels hat while making a hand signal disrespecting a rival gang.[4]

As to the charged shooting itself, Officer Guerrero explained the apartment building where the shooting took place was located in Black P-Stones territory, specifically in the area known as the Bittys' turf. The prosecutor presented a hypothetical scenario to Officer Guerrero that was intended to track the facts of the case, asking him to assume, among other things, that two sisters get into a fight with a female neighbor; the neighbor's boyfriend, a Black P-Stones gang member, gets involved in the fights; the neighbor and her boyfriend "say they are from BPS and that they are going to get their friends" during the fights; the boyfriend contacts a second Black P-Stones gang member via phone calls and text messages; the second gang member tells his BPS confederate he will "be there in five" and later arrives; and the second Black P-Stones member pulls a gun and shoots at a man dating one of the sisters when fighting breaks out between that man and the neighbor's Black P-Stones-member boyfriend. The prosecutor asked Officer Guerrero whether the crime described in the hypothetical scenario was

---

[4]     Another of the photos found on defendant's cell phone depicted defendant "throwing the gang sign" that signified "Jungle Stone Love."

committed for the benefit of, at the direction of, and in association with a criminal street gang, and Officer Guerrero opined that it was.

Officer Guerrero explained his opinion was "based on the fact that you have two documented, self-admitted gang members, Black P-Stones . . . . In the gang world, respect means everything. If you're disrespected in your own territory, you have to show front. You have to show face. That means when somebody comes into your neighborhood and your girlfriend is a Black P-Stone associate or a gang member and she's getting into a fight, you're going to defend that territory and that person just on the mere fact they are from the neighborhood. They are from your gang. [¶] . . . [¶] The time of day, broad daylight, what they are doing is showing no fear toward the community in what's going on. [¶] It's for the benefit and the association of the gang. You're going to show your face. You're going to show you're not going to be disrespected." Officer Guerrero continued: "[T]he territory of the gang is very important. You don't want to lose a street, don't want to lose a portion or corner. Someone comes into your neighborhood and [is] assaulting either your friend, associate from your own gang, you have to show to the gang you're active, violent[,] and are going to defend, do whatever you need to do to take care of business to show your alliance to that gang."

The prosecutor additionally asked Officer Guerrero to explain how gang members usually react when asked by other members of the gang to commit acts of violence. Officer Guerrero responded there would be repercussions (including getting kicked out of the gang, beaten up, or killed) if a gang member were to refuse a request to commit a crime or do something for the gang.

11

## 2.     *Alonso's testimony*

During the defense case, defendant's attorney asked her expert, Professor Alonso, whether the "BPS Jungles and BPS City Stones [i.e., the Bittys]" were "one gang." Alonso answered, "The way I look at it is I look at it as two different gangs under a similar umbrella." In Professor Alonso's opinion, there was "an individuality to where [he]'d call the [Bittys] one gang and the Jungle Stones a separate gang." His view of this "individuality" included his belief that the Jungles and Bittys each had a different hierarchy, had two different "turfs" in "radically different types of communities," and had "some unique rivalries" with other gangs—even though Professor Alonso conceded both the Bittys and the Jungles did also share "similar rivalries" with other Crip gangs.

The defense asked Professor Alonso a series of hypothetical questions that incorporated the basic facts of the case and progressively added certain additional elements, for example, that one of the individuals involved in the fights was a Black P-Stones gang member. Asked to assume there were two Black P-Stones gang members present at the time of the shooting (which took place after a fight that originally began between two "girls"), Professor Alonso opined the shooting was not done for the benefit of a criminal street gang. When asked to further assume that, during one of the fights preceding the shooting, one of the Black P-Stones gang members had yelled "BPS," Professor Alonso testified that his answer to the question of whether the "fight that involved the shooting" was done for the benefit of the gang would "depend[ ] on the context of how BPS was stated." He asserted there were ways someone could say "BPS" that would not affect his previously expressed opinion, but he acknowledged

12

the person was "probably" acting on behalf of the gang if "BPS" was stated in an aggressive manner.

### D. *Verdicts and Sentencing*

The jury found defendant guilty on two counts of assault with a firearm in violation of section 245, subdivision (a)(2): count two of the information pertaining to victim Ross and count three of the information pertaining to victim George. The jury found true the gang (§ 186.22, subd. (b)(1)(C)) and firearm enhancements (§ 12022.5, subd. (a)) alleged in connection with each count. The jury also found true a great bodily injury enhancement (§ 12022.7, subd. (a)) alleged solely in connection with the count two assault on victim Ross. The jury was unable to reach a verdict on count one of the information, which charged defendant with the willful, deliberate, and premeditated attempted murder of King. The trial court declared a mistrial on that count and subsequently dismissed it.

The trial court sentenced defendant to a total of 23 years and eight months in state prison. On the count two assault with a firearm conviction, the court imposed an 18-year prison term, consisting of the upper term of four years for the conviction, plus a four-year term for the firearm enhancement and a ten-year term for the gang enhancement. The court imposed but stayed a three-year prison term for the great bodily injury enhancement on count two. On the count three assault with a firearm conviction, the trial court imposed a consecutive one-year term (one-third of the middle term of three years), plus one-year and four months for the firearm enhancement and three-years and four months for the gang enhancement. The trial court awarded

13

defendant 769 days of presentence credit: 669 days of actual custody credit and 100 days of conduct credit.

## II.  DISCUSSION

The outcome of this appeal is dictated in large part by two California Supreme Court cases that discuss what evidence is necessary to support a jury's true finding on a gang enhancement: *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*) and *People v. Albillar* (2010) 51 Cal.4th 47 (*Albillar*).  Defendant contends the prosecution failed to prove Black P-Stones was a criminal street gang for purposes of section 186.22 because the evidence indicated the Jungles subset and the Bittys subset were actually two separate gangs and there was no evidence that would allow the jury to conclude they were part of "one big gang," the Black P-Stones.  The argument turns, and fails, on comparison to *Prunty*: unlike that case, the evidence here— particularly, Officer Guerrero's expert testimony—was sufficient to establish the associational connection required between the Black P-Stones and the Bittys and Jungles subsets.  Defendant also maintains there was insufficient evidence he committed the offenses for the benefit of a criminal street gang.  Following principles articulated in *Albillar*, we hold there was enough evidence to prove the crimes were in fact gang related.  Evidence that defendant responded to a request for assistance made by fellow Black P-Stones member Jones in light of ongoing fighting in Black P-Stones territory permitted the jury to infer defendant committed the two firearm assaults in association with the Black P-Stones.

We therefore affirm defendant's convictions, but we reverse the sentence imposed.  The Attorney General concedes, and we

hold, the 16-month prison term the trial court imposed for the firearm enhancement alleged in count three of the information was unauthorized because the court imposed a prison term for the gang enhancement on that count as well; the relevant Penal Code statute permits application of only the greater of the two enhancements. A remand for resentencing is required under the circumstances, and upon resentencing defendant, the trial court must also give him the 11 additional days of presentence custody credit to which he is undisputedly entitled.

### A. Standard of Review

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60; accord, *Prunty*, *supra*, 62 Cal.4th at p. 71 ["We apply a deferential standard of review when evaluating . . . whether the evidence . . . [is] sufficient to satisfy the STEP Act's [criminal street gang] definition"].) "This standard applies whether direct or circumstantial evidence is involved." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 56; see also *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

## B. Sufficient Evidence Supports the Jury's Gang Enhancement True Findings

Section 186.22, subdivision (b)(1) authorizes enhanced criminal punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." A "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated] criminal acts[,] . . . having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A "pattern of criminal gang activity" means "the commission of . . . or conviction of two or more of [certain enumerated offenses]" that "were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).)

Our assessment of the sufficiency of the evidence in this case appropriately includes testimony by qualified gang expert Officer Guerrero.[5] An expert can properly "express an opinion, based on hypothetical questions that track[ ] the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose. 'Expert opinion that particular

---

[5] The defense did not object to Officer Guerrero's qualification as an expert witness. Trial counsel did make several evidentiary objections to aspects of Officer Guerrero's testimony, most of which the trial court overruled. Defendant does not challenge the trial court's evidentiary rulings on appeal.

criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement.  [Citation.]"  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see also *Prunty*, *supra*, 62 Cal.4th at pp. 82-85 [evaluating whether gang expert testimony was sufficient to allow jury to find prosecution had proven the existence of a criminal street gang for purposes of section 186.22].)

> ### 1.   *There is substantial evidence the Black P-Stones gang is a criminal street gang within the meaning of section 186.22*

Defendant argues the proof at trial was deficient because he believes the Jungles and the Bittys are gangs in their own right and there was no evidence that would permit the jury to conclude they were part of one larger "ongoing organization, association, or group" (§ 186.22, subd. (f)), namely, the Black P-Stones.  Relying on that premise, he specifically argues there was no proof of the pattern of criminal activity required by section 186.22 because the two predicate offenses the prosecution sought to prove were committed by one Bittys member and one Jungles member; in defendant's view, this means there was no proof of two predicate offenses committed by one criminal street gang.  Defendant's argument fails, however, because his premise is faulty.

In *Prunty*, *supra*, 62 Cal.4th 59*,* the California Supreme Court considered "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets."  The court held that "where the prosecution's case positing the existence of a single

17

'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Id.* at p. 71.) "In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang." (*Id.* at pp. 78-79.) But it is not enough for the prosecution to show "the group simply shares a common name, common identifying symbols, and a common enemy." (*Id.* at p. 72.)

The *Prunty* court identified several types of evidence the People may present to demonstrate the associational relationship between a gang and one of its subsets. The prosecution may, for instance, "show that various subset members exhibit behavior showing their self-identification with a larger group." (*Prunty*, *supra*, 62 Cal.4th at p. 71.) This self-identification evidence can include facts that demonstrate two gang subsets "mutually acknowledge one another as part of that same organization," but it is insufficient to show "merely that a local subset has represented itself as an affiliate of what the prosecution asserts is a larger organization." (*Id.* at p. 79.) The prosecution may also elicit testimony that alleged subsets of an overarching gang "use . . . the same 'turf'" and routinely act to protect the same territory. (*Id.* at pp. 73, 77.) Facts indicating two or more subsets have "'work[ed] in concert to commit a crime'" (*id.* at p. 78) or "'hang out together' and 'back up each other'" (*ibid.*) also may help demonstrate the requisite informal association among subsets alleged to comprise a larger criminal street gang.

18

"The critical shortcoming in the prosecution's evidence [in *Prunty*] was the lack of an associational or organizational connection between the two alleged Norteño subsets that committed the requisite predicate offenses[ ] and the larger Norteño gang that Prunty allegedly assaulted [the victim] to benefit." (*Prunty*, *supra*, 62 Cal.4th at p. 81.) That is, the prosecution introduced evidence of two predicate offenses involving three alleged Norteño subsets (different than the subset to which the defendant belonged), but the prosecution's gang expert never addressed the overarching Norteño gang's relationship to these three subsets and instead "simply described the subsets by name, characterized them as Norteños, and testified to the alleged predicate offenses." (*Id.* at pp. 82-83.) That, of course, meant the prosecution's gang expert never testified "that the subsets that committed the predicate offenses, or any of their members, self-identified as members of the larger Norteño association that [the] defendant sought to benefit." (*Id.* at p. 82.) While the gang expert did testify Norteño gang subsets in general used the same name, symbols, colors, gang signs, and the like, he did not address whether the subsets whose members committed the predicate offenses were among those exhibiting these common characteristics. (*Id.* at pp. 83-84.)

Officer Guerrero's testimony does not suffer from the defects that rendered the expert testimony in *Prunty* insufficient. Unlike *Prunty*, the gang subsets involved in the proffered predicate offenses in this case were the very same subsets that were the subject of Officer Guerrero's testimony linking them to the overarching Black P-Stones gang. He testified the Bittys and the Jungles were the "same family, criminal organization," "worked together," and were "part of one gang, the Black P-

19

Stones." He explained that "[w]hen they do a crime, they do it together, a Bitty or a Jungle, for the same purpose." And he testified the two subsets had "safe passage" to enter the territory controlled by the other "because they are from Black P-Stones."

Defendant argues, however, that Officer Guerrero merely "provided conclusions that were not entitled to any weight because they were inconsistent with the evidence and purely speculative." We see the record quite differently.

Unlike the expert testimony in *Prunty* describing "the Norteños" as "a Hispanic street gang," which our Supreme Court found "purely conclusory and essentially of no use to the fact finder" (*Prunty*, *supra*, 62 Cal.4th at pp. 84-85), Officer Guerrero's testimony was backed by specific evidence. In scholastically reminiscent detail, he recounted the origins of the Black P-Stones chapter in Los Angeles, making it clear how and why the gang developed to include both the Bittys and the Jungles subsets.[6] This was significant evidence of an associational connection: just as licit organizations like Berkshire Hathaway broaden their reach by mergers and acquisitions, so too can informal, loosely organized illicit associations, which, according to Officer Guerrero, is what happened when the Bittys needed reinforcements and recruited the Jungles to join them.[7]

---

[6] Because Officer Guerrero was testifying as an expert witness, his testimony alone was competent to establish this history. (Evid. Code, § 801, subd. (b); cf. *People v. Sengpadychith* (2001) 26 Cal.4th 316, 322 [police gang expert can testify to gang's primary activities].)

[7] This testimony was not merely evidence that might permit the inference that the Bittys and the Jungles share a common origin (compare *Prunty*, *supra*, 62 Cal.4th at p. 83). It was

In addition, there is a plethora of evidence in the record that the Bittys and the Jungles subsets self-identified as part of the Black P-Stones and "mutually acknowledge[d] one another as part of that same organization." (*Prunty*, *supra*, 62 Cal.4th at p. 79.) That evidence includes the "all the way from the Bitty[s] to J's" saying that Black P-Stones members used according to Officer Guerrero—a saying that plainly conveys the Bittys and the Jungles are constituents of the Black P-Stones gang. The evidence of self-identification also includes the text messages on defendant's phone with numerous "P-Stone" references when the texting parties would refer to one another (including the "WYA [i.e., where you at] P-Stone" text Jones sent defendant when calling him to the scene of the fights), as well as the P-Stone reference made even during defendant's post-arrest phone call from jail.

Also backing Officer Guerrero's opinion that the Bittys and the Jungles were associated subsets of the Black P-Stones gang was the law enforcement gang database he consulted, which listed the 1,100-plus individuals as members of the Black P-Stones, albeit further divisible into a 800-person Jungles subset and a 300-person Bittys subset. The facts of the charged offenses provided yet further evidentiary grounding for Officer Guerrero's opinions. The jury could infer defendant's "NRK" tattoo indicated he was a member of the Jungles subset, yet Jones called on defendant for aid in responding to fights occurring at the apartment building located in the *Bittys'* portion of the gang's turf. This is evidence the jury could use to infer, in the language

---

instead evidence of how the gang evolved into the organization it was at the time of trial.

21

of *Prunty*, that the two subsets "'back up each other'" and, at least when called for, "act to protect the same territory." (*Prunty*, *supra*, 62 Cal.4th at pp. 77-78.) In fact, defendant's own body was evidence of the organizational connection between the Black P-Stones gang and its subsets: defendant had NRK tattooed on his back but also had BPS tattooed on his stomach—a corporeal representation of the association between the gang and one of its subsets (or, more precisely, sub-cliques).

There was accordingly substantial evidence of an associational and organizational connection that unites members of the Black P-Stones, whether from the Bittys or the Jungles subset. The predicate offenses relied on by the prosecution were therefore both attributable to the Black P-Stones and section 186.22, subdivision (f)'s definition of a "criminal street gang" was satisfied.

> ### 2. There is substantial evidence defendant committed the assaults in association with a criminal street gang

To prove an allegation under section 186.22, subdivision (b)(1) true, the prosecution must introduce evidence to establish both statutory elements, i.e., that the underlying crime was "gang related" and that the defendant acted with the requisite specific intent.[8] (*Albillar*, *supra*, 51 Cal.4th at p. 59.) Defendant contends the prosecution failed to prove he committed the crimes

---

[8] Defendant contests only the first of these elements. We therefore do not discuss the evidence on which the jury could have relied to find defendant acted with the requisite specific intent.

for the benefit of a criminal street gang, but section 186.22, subdivision (b)(1) describes what the prosecution must prove in the disjunctive, i.e., that the crime must be "committed for the benefit of, at the direction of, *or* in association with any criminal street gang." (Emphasis added.) Thus, regardless of whether the evidence sufficed to establish defendant committed the charged assaults for the benefit of the Black P-Stones (a slightly closer question), we uphold the jury's true findings because there is substantial evidence defendant and Jones "came together *as gang members* [to commit the assaults] and, thus, that they committed the[ ] crimes in association with the gang." (*Albillar*, *supra*, at p. 62.)

There was ample evidence at trial that the charged firearm assaults were gang related. There was strong evidence defendant and Jones were Black P-Stones gang members; among other things, the two were photographed together wearing gang paraphernalia and "throwing" gang signs. Officer Guerrero also testified the apartment building that served as the backdrop for the charged firearm assaults was located in territory claimed by the Black P-Stones. The charged assault offenses also fell within the categories of "ADW shootings" and assaults with deadly weapons that Officer Guerrero identified as among the Black P-Stones primary activities. In addition, during one of the fights that preceded the shootings, Jones and/or Hopson had yelled the BPS gang name and threatened "to call people," a threat Jones made good on when he called defendant, who later arrived for the final fight.[9] And during that final fight, the jury was entitled to

---

[9] The post-arrest phone call from defendant to Jones made it clear that Jones called defendant to request aid in connection with the ongoing fighting.

find Jones and defendant acted in concert: after Hopson yelled to Jones to "bring that thing out that bag," Jones made a similar statement and he and defendant then emerged from the apartment building—with the shooting starting soon thereafter.

This evidence amounts to proof that is just as substantial (and perhaps more so) as the key facts our Supreme Court found sufficient in *Albillar* to sustain a section 186.22 gang enhancement. (*Albillar*, *supra*, 51 Cal.4th at p. 60 [the defendants "relied on their common gang membership and the apparatus of the gang" to commit the charged crimes].) Especially when combined with Officer Guerrero's expert opinion on the importance of respect to gangs, the imperative to protect gang territory, and the need to comply with requests to commit an act of violence made by a fellow gang member, the jury's finding that the charged assaults were gang related was well supported by the evidence.[10]

---

[10] The evidence presented in the cases defendant cites to argue the contrary was significantly weaker. In *People v. Ramon* (2009) 175 Cal.App.4th 843, there were no facts that linked the crimes at issue (receiving a stolen vehicle and possession of a firearm offenses) to a crime likely to be committed by the gang, and thus, nothing to support the gang expert's opinion that the crimes were gang related. (*Id.* at p. 853 ["The analysis might be different if the expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang. That did not occur and we will not speculate"].) In *People v. Ochoa* (2009) 179 Cal.App.4th 650, the crime was not committed in gang territory and the defendant was not accompanied by a fellow gang member. (*Id.* at p. 662.)

**[Parts II.C and II.D, below, are deleted from publication. See *post* at page 26 for where publication is to resume.]**

C.   *The Firearm Enhancement on Count Three Should Not Have Been Applied*

Section 1170.1, subdivision (f) provides in relevant part: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense." The trial court erred when it imposed both the firearm enhancement and the gang enhancement alleged in count three of the information.

In *People v. Rodriguez* (2009) 47 Cal.4th 501 (*Rodriguez*), the defendant was convicted of three counts of assault with a firearm. (*Id.* at p. 505.) The jury also found true two enhancements as to each count: a section 12022.5, subdivision (a) enhancement for personal use of a firearm while committing a felony, and a section 186.22, subdivision (b)(1)(C) enhancement for committing a violent felony for the benefit of a criminal street gang. (*Ibid.*) On review, the California Supreme Court overturned the sentence, finding it had been imposed in violation of section 1170.1, subdivision (f). (*Id.* at p. 508.) The court explained its holding as follows: "[T]he standard additional punishment for committing a felony to benefit a criminal street gang is two, three, or four years' imprisonment. [Citation.] But when the crime is a 'violent felony, as defined in subdivision (c) of Section 667.5,' section 186.22's subdivision (b)(1)(C) calls for additional punishment of 10 years. Here, defendant became eligible for this 10-year punishment *only* because he 'use[d] a

25

firearm which use [was] charged and proved as provided in . . . Section 12022.5.' [Citation]." (*Id.* at p. 509.)

The error identified in *Rodriguez* is identical to the error in this case. Defendant's conviction on count three of the information was a violent felony solely because the jury found true the charged section 12022.5, subdivision (a) enhancement for personal use of a firearm (unlike the conviction on count two, where the jury also found true a great bodily injury enhancement). The trial court therefore could not, consistent with section 1170.1, subdivision (f), enhance defendant's sentence for both the gang and the personal use of a firearm allegations. We accordingly reverse the sentence imposed and remand for resentencing. (*Rodriguez*, *supra*, 47 Cal.4th. at p. 509 ["The proper remedy, however, was *not* to strike the punishment under section 12022.5 but to reverse the trial court's judgment and remand the matter for resentencing. [Citation.] Remand will give the trial court an opportunity to restructure its sentencing choices in light of our conclusion that the sentence imposed here violated section 1170.1's subdivision (f)"].)

> D.  *Defendant Is Entitled to Additional Presentence Credit*

The parties agree defendant is entitled to eleven additional days of presentence custody credit. We agree the parties are correct, and at the time defendant is resentenced, the trial court is directed to give him credit for a total of 780 days, consisting of 679 days of actual custody credit and 101 days of conduct credit.

**[The remainder of the opinion is to be published.]**

26

DISPOSITION

Defendant's convictions are affirmed.  The sentence imposed is reversed and the matter is remanded to the trial court for resentencing consistent with this opinion and section 1170.1, subdivision (f).

CERTIFIED FOR PARTIAL PUBLICATION


BAKER, J.

We concur:


KRIEGLER, Acting P.J.


KIN, J.[**]

---

[**]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.