Filed 3/25/22  P. v. Torales CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JOHN MARTIN TORALES,<br><br>        Defendant and Appellant. | F078395<br><br>(Super. Ct. No. VCF321528)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant John Martin Torales committed a series of armed robberies between June 17, 2015, and July 2, 2015, with Estevan Gomez. Gomez was fatally shot by police during the course of his arrest. Torales was convicted by jury of multiple counts of assault with a semiautomatic firearm (Pen. Code,[1] § 245, subd. (b)); second degree robbery (§ 211); conspiracy to commit robbery (§§ 182, subd. (a)(1), 211); conspiracy to commit assault with a deadly weapon (§§ 182, subd. (a)(1), 245, subd. (b)); and attempted robbery (§§ 664/211). In addition, enhancements were found true for the personal use of a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b) & (e)(1)); the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)); the commission of a prior serious felony (§ 667, subd. (a)); serving a prior prison term (§ 667.5, subd. (b)); and suffering a prior strike conviction within the meaning of the Three Strikes law (§§ 1170.12, subds. (a)-(d) & 667, subds. (b)-(i)). Torales was sentenced to an aggregate term of 98 years eight months in state prison.

He raises the following claims on appeal: (1) the prosecutor failed to establish a connection between Varrio Farmas Catorce, the subset to which Torales claimed membership to, and the larger Norteño criminal street gang for which he acted to benefit; (2) there is insufficient evidence showing Torales committed the armed robberies for the benefit of, at the direction of, or in association with the Norteños; (3) the prosecutor's gang expert related case specific hearsay while testifying about the subjects of the predicate offenses; (4) the trial court erred by instructing the jury pursuant to CALCRIM No. 315, which lists the witness's level of certainty as one of the 14 factors the jury should consider when evaluating identification testimony; (5) the prosecutor adduced

---

**1** All further undefined statutory citations are to the Penal Code unless otherwise indicated.

evidence supporting the existence of only one conspiracy, not two; (6) the trial court prejudicially erred by failing to instruct the jury sua sponte to decide whether there was one all-encompassing conspiracy (to commit robbery) versus two separate conspiracies; (7) the section 667.5, subdivision (b) enhancement must be stricken pursuant to Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill No. 136); and (8) Torales must be afforded an opportunity to request a hearing on his ability to pay court-imposed fines, fees, and assessments.

Following submission of the parties' appellate briefs, the parties submitted supplemental briefing on several issues, including whether Torales is entitled to relief under the following laws:  (1) Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333), which significantly amended section 186.22; (2) Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Senate Bill No. 1393), which vests trial courts with the discretion to strike five-year sentencing enhancements for prior serious felony convictions (§ 667, subd. (a), § 1385); (3) Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567), which amended the law regarding the trial court's sentencing discretion by making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1) & (2)); and (4) Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill No. 518), which amends section 654 to remove the requirement that the court impose the longest potential term of imprisonment (Stats. 2021, ch. 441, § 1).

We conclude the following:  (1) the gang enhancements (§ 186.22, subd. (b)) and firearm enhancements for the use of a firearm by a principal (§ 12022.53, subds. (b) & (e)(1)) must be vacated following the passage of Assembly Bill No. 333, which retroactively applies to Torales's nonfinal judgment of conviction; (2) upon this record, there is insufficient evidence of two distinct conspiracies.  As a result, Torales's conviction for conspiracy to commit assault with a deadly weapon (§§ 182, subd. (a)(1), 245, subd. (b), count 20) must be reversed; (3) the prior prison term enhancement

3.

(§ 667.5, subd. (b)) applied to Torales's sentence is stricken; (4) this case must be remanded back to the trial court so that the court may determine whether to exercise its discretion to strike the five-year prior serious felony enhancement (§ 667, subd. (a)(1)) applied to Torales's sentence; and (5) at resentencing, Torales may request a hearing on his ability to pay the court-imposed fines, fees, and assessments. In all other respects, the judgment is affirmed.

## PROCEDURAL HISTORY

On August 8, 2016, the Tulare County District Attorney's Office filed an amended information charging Torales with the following offenses: assault with a firearm (§ 245, subd. (b), counts 1-10), robbery (§ 211, counts 11-19), conspiracy (§ 182, subd. (a)(1), counts 20 & 21), possession of a firearm by a felon (§ 29800, subd. (a)(1), count 22), and masked criminal possession of a firearm in public (§ 25300, subd. (a)). The information further alleged enhancements for the personal use of a firearm (§§ 12022.5, subd. (a); 12022.53, subds. (b) & (e)(1)); that offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)); that Torales had suffered a prior serious felony conviction (§ 667, subd. (a)(1)), he had served two prior prison terms (§ 667.5, subd. (b)), and he had suffered one prior strike conviction within the meaning of the Three Strikes law (§§ 1170.12, subds. (a)-(d) & 667, subds. (b)-(i).)

On August 16, 2016, Torales's jury trial commenced.

On August 24, 2016, Torales was convicted on counts 5, 6, 14, 15, and 20 through 23. The jury also found true all enhancements alleged on these counts. Torales was acquitted on counts 3, 4, and 13, and the jury deadlocked on counts 1, 2, 7 through 12, and 16 through 19. The trial court declared a mistrial on the deadlocked counts.

On May 30, 2017, Torales was retried on counts 1, 2, 7 through 12, and 16 through 19.

4.

On June 7, 2017, the jury found Torales guilty on all counts and found true all enhancements alleged. Following a bifurcated proceeding, the court found true all prior conviction allegations.

On November 5, 2018, the trial court sentenced Torales to an aggregate term of 81 years eight months in state prison.[2]

On November 7, 2018, Torales filed a timely notice of appeal.

On October 4, 2019, during the pendency of this appeal, the trial court sentenced Torales to an additional term of 17 years four months in state prison.

## STATEMENT OF FACTS

**First Trial**

*June 25, 2015 – 7-Eleven, Visalia (Counts 5 & 14)*

On June 25, 2015, at around 2:00 a.m., C.W. was working at a 7-Eleven in Visalia. A man entered wearing a black hooded sweatshirt with a San Francisco 49ers logo, jeans, white shoes, and a bandana covering everything but his eyes.

The man pointed a handgun in C.W.'s face and demanded money. C.W. removed cash from the register and handed it over to him. The man had a tattoo on his left hand, which was depicted on a surveillance video recording of the robbery. Tommy P. was across the street at the time of the robbery and saw a man run from the 7-Eleven and get into a gold sedan parked behind 4A Liquor across the street.

*June 25, 2015 – Fastrip, Lindsay (Counts 6 and 15)*

On June 25, 2015, at around 2:30 a.m., S.A. was working at the Fastrip in Lindsay. A light-complected man wearing a black hooded sweatshirt with a white 49ers logo, blue jeans, white shoes, and a black bandana covering his face walked into the store. The man pointed a semiautomatic handgun at S.A. and demanded money.

---

[2] In case No. PCF352655, Torales was convicted of being an accessory (§ 32), with a section 186.22, subdivision (b) enhancement. His aggregate prison sentence of 81 years eight months included a term of two years four months based upon this conviction.

S.A. complied, placing money from the cash register on the counter. The man grabbed the money and fled. Surveillance cameras recorded the incident and showed the man holding the gun in his right hand and tattoos of "666" and four dots on his left hand.

*Police Investigation*

Between June 17, 2015 and July 3, 2015, there were nine robberies in Tulare County and Fresno County: the Valero gas station in Visalia, the Chevron gas station in Tipton, the Fiesta Latina Market in Poplar, the 7-Eleven in Visalia, the Fastrip in Lindsay, the Arco in Kingsburg, the Valera in Selma, the USA Gas Station in Earlimart, and the Chevron gas station in Tipton.

The first robbery, occurring on June 17, 2015, at the Valero gas station in Visalia, was assigned to Visalia Police Detective James Cummings. When Cummings was subsequently assigned to investigate the June 25th robbery of the 7-Eleven in Visalia, he realized there was a similar method of operation used in that robbery and the robbery of Valero gas station, and that the same perpetrator might be responsible.

During both robberies, the suspect wore blue jeans, white shoes, a hooded sweatshirt that was pulled over his head, and a mask. The robberies both occurred after midnight. Surveillance video depicting the robberies showed the suspect extend a gun in his right hand immediately upon entering each respective store, while placing his left hand in his front pocket. The suspect had a tattoo on his left hand which did not extend past his knuckle line.

Cummings eventually identified Estevan Gomez as a potential suspect. Tommy P. identified Gomez's car, a 2002 pewter Mercury Sable, as the same car used during the June 25th robbery of the 7-Eleven in Visalia.

Police tracked the vehicle to a residence in Visalia, where Torales had been staying with his girlfriend. Gomez lived at the residence on and off as well. When police searched the home, they found a black hooded sweatshirt with a white San Francisco 49ers emblem on the front that matched the sweatshirt worn by the perpetrator of the 7-

6.

Eleven robbery in Visalia, the Fastrip in Lindsay, the Arco in Kingsburg, and the USA gas station in Earlimart.

In Gomez's vehicle, police found a white T-shirt that had been cut so it could be used as a facemask. Cummings opined that the facemask appeared to be consistent with the mask worn by the perpetrator of the Valero gas station robbery. Cummings further opined that the white tennis shoes Torales was wearing when he was taken into custody were similar to the shoes worn by the perpetrator of the Fastrip robbery in Lindsay.

When police searched Gomez's and Torales's phones, they discovered that Gomez's phone was shown to be at the location of all of the robberies. Police also discovered a photograph of Gomez on Facebook where he was wearing a sweatshirt matching the Ecco sweatshirt worn by the perpetrator of the June 17, 2015 Valero robbery in Visalia.

**The Gang Evidence**

*The Gang Expert's Testimony*

Visalia Police Officer Austin Huerta testified as a gang expert for the prosecution. According to Huerta, the Norteños are the largest gang in Tulare County. The gang is organized in a hierarchical structure with the Nuestra Familia (NF) prison gang at the top, the Norteños or Northerners below the NF, and various subsets that all operate under the same Norteño gang at the bottom. The subsets call themselves neighborhoods.

Huerta opined that Torales was a Norteño gang member with a subset called Varrio Farmas Catorce (VFC). VFC is based out of Farmersville and has approximately 70 members. The primary activities of the VFC Norteños include: narcotics sales, drive-by shootings, assaults with deadly weapons, and robberies.

Huerta explained Torales had numerous gang-related tattoos, including "VFC" and "X4" on his left wrist, four dots on his left hand and one dot on his right hand, "VF" on his stomach, "Norte" on the back of his head, and "TC" on his calf. Huerta also based his

7.

opinion on the fact that Torales had numerous prior contacts with police during which Torales admitted he was associated with VFC, the Norteños, or the Northern gang.[3]

Huerta also found significant the fact that Torales was housed in jail unit No. 42 at the Bob Wiley Detention Facility following his arrest. According to Huerta, Torales could not have been housed in this unit unless he were an active Norteño gang member. Unit Nos. 41 and 42 exclusively house active Norteños.

Huerta testified that all Norteños on the street are required to pay taxes. To that end, Huerta explained that in 2015, a man named "Pistol Pete" was the Norteño regional commander for Tulare County. Pistol Pete issued a directive to the gang members below him to make money for the gang. All of the subsets within Tulare County were required to earn and to contribute a portion of their earnings to the gang.

Huerta listened to a recorded jail phone call made by Torales following his arrest. During the phone call, Torales instructed another individual to "try to find out – get at my old lady, find out of [*sic*] she … uh, if the homey's … sent a squad," "[c]ause that was the whole reason why I went to go … to Farmersville to go get thing (inaudible) come up for them." Huerta opined that Torales was concerned about whether a hit squad had been sent to his house. Torales either owed the gang money from a preexisting debt, or the gang was coming to collect its share of proceeds from the robberies.

Based upon a hypothetical mirroring the facts of the instant case, Huerta opined that the robberies were committed for the benefit of, at the direction of, or in association with the gang. The robberies would benefit the gang financially, because the perpetrator would be required to pay taxes to the gang. The gang would also benefit reputationally from the robberies.

---

**3**     Several police officers offered testimony to this effect at trial. During one prior contact, Torales stated he was an associate of the Northern gang and VFC out of Farmersville. Torales further claimed he was a registered member of the gang.

### Defense Expert

Canuto Garza, a retired employee from the California Department of Justice, testified as an expert for the defense. Although Torales told Garza he was a VFC gang member, Garza did not agree that the robberies were necessarily gang related. Garza testified that not all Norteños pay taxes to the gang, and that the gang does not force its members to pay taxes. He further opined that Torales's statements made in his recorded jail phone call could mean anything, and that the phrases Torales used during the call were not exclusive to gangs.

### Huerta's Testimony in Rebuttal

In rebuttal, Huerta testified that all Norteños on the street pay taxes, even low functioning members of the gang. Huerta explained that taxes benefit the gang because the money gets channeled back to the Nuestra Familia. Although Garza had expressed uncertainty as to the leadership of the Norteño gang within Tulare County, Huerta stated Pistol Pete was in charge of every city in Tulare County. This would include the City of Tulare.

## Second Trial

### June 17, 2015 – Valero, Visalia (Counts 1 & 11)

On June 17, 2015, at around 2:00 a.m., R.F. was working as a cashier at the Valero gas station in Visalia when she heard the door open. She saw a man wearing a black hooded sweatshirt with a white scarf around his face enter the store. The man pointed a handgun at R.F. and demanded money. R.F. handed the man the money from the register. After which, the man fled.

Surveillance cameras recorded the incident. The video depicted the perpetrator wearing a black hooded sweatshirt with a white emblem on the front and white shoes. The perpetrator held the gun in his right hand, and had his sleeve pulled down exposing only the top of his knuckles on his left hand.

R.F. remembered the perpetrator had distinctive eyes because he had very dark eyes, thick eyebrows, and marks on his forehead. Within days of the robbery, two men walked into her store. R.F. recognized one of the men as the perpetrator based upon his eyes.

At trial, Flores identified Torales at trial as the man who had robbed her. She expressed certainty about her identification.

### June 19, 2015 – Chevron, Tipton (Counts 2 & 12)

On June 19, 2015, between 3:30 and 4:00 a.m., A.P. was working at the Chevron gas station in Tipton when a man burst through the back door. The man was wearing a black hooded sweatshirt with the hood pulled over his head, a bandana covering his face below his eyes, and black pants. He pointed a semiautomatic firearm at A.P. and demanded A.P. give him money or the man would kill him.

A.P. observed that the man had "very distinguished" eyes. A.P. raised his arms and walked to the cash register. He opened the register as the man repeated, " 'Give me all the money. Give me the … money or I'm gonna kill you.' " A.P. handed him around $600 and the man fled. At trial, A.P. identified Torales as the perpetrator.

The parties stipulated to the fact that on the same night, Estevan Gomez attempted to rob the Fiesta Latina Market in Poplar. Gomez was armed with a semiautomatic firearm and was wearing a black hooded sweatshirt with a cloth face covering. The parties also stipulated to the fact that Gomez was deceased at the time of Torales's trial.

### June 29, 2015 – AM/PM, Kingsburg (Counts 8 & 17)

On June 29, 2015, at around 1:30 a.m., E.P. was working at the AM/PM gas station in Kingsburg when two men entered the store carrying guns. One of the men told a customer to go to the back and the other guarded the front door. The man that approached the register was wearing a dark hooded sweatshirt with white shoes, blue jeans, and a covering on his face. He pointed a handgun at E.P.

10.

The man guarding the front door was holding a semiautomatic firearm. He was wearing a black hooded sweatshirt with a 49ers logo on the front, white gloves, a dark-colored bandana over his face, and a Washington Nationals baseball cap. The 49ers sweatshirt appeared too small for the person wearing it as it did not reach the perpetrator's waste line.

E.P. struggled to open the register. The man standing at the register told her, "hurry up and give me the money." E.P. handed him the money and both men fled.

### June 29, 2015 – Valero, Selma (Counts 7 & 16)

On June 29, 2015, at around 2:30 a.m., D.S. was working as the night clerk at the Valero in Selma when two men came to the door with their heads down. D.S. pressed a button to unlock the front door. When he noticed the men were wearing masks, he attempted to lock the door but the men had jammed the door open.

The men entered the store wearing hooded sweatshirts with the hoods covering their heads and masks covering below their eyes. One of the men approached the register, pointed a handgun in D.S.'s face, and demanded, " 'Give me the money.' " The second man stayed by the door and held it open. Both men were wearing blue or black jeans, black hoodies, and either a blue or a black mask. D.S. handed over all the money from the register and the men fled.

### July 3, 2015 – USA Gas, Earlimart (Counts 10 & 19)

On July 3, 2015, at around 4:00 a.m., M.R. was working at the USA gas station in Earlimart when a man entered the store holding a gun. The man was wearing a black hooded sweatshirt with something white on the front of it, blue jeans, white shoes, and had a black piece of cloth covering his face. He pointed a gun at M.R. and the customers inside the store and told M.R. to give him the money.

M.R. replied that he did not have any money and showed him a $5 bill in the cash register. The man left without taking the $5. Surveillance video showed the perpetrator

11.

wearing a black hooded sweatshirt with a white emblem on the front. The perpetrator held a gun in his right hand and covered his left hand with the sleeve of his sweatshirt.

### *July 3, 2015 – Chevron, Tipton (Counts 9 & 18)*

On July 3, 2015, at around 4:30 a.m., A.P. was robbed for a second time while working at the Chevron in Tipton. The same man burst through the front door wearing the same outfit: a black hooded sweatshirt with a white Ecco logo, blue jeans, and white shoes. This time, however, the perpetrator wore a different bandana. A.P. observed that the perpetrator had the same eyes and eyebrows, same height and stature, and had the same voice as the man who had robbed the Chevron two weeks prior.

The perpetrator repeatedly demanded, "Give me the money or I'm gonna kill you, kill you, kill you," as he pointed the gun at A.P. He paced back and forth as A.P. retrieved money from the register. The man grabbed the cash and fled. A.P. ran after the perpetrator and tried to shoot at him.

A.P. subsequently identified Torales as the perpetrator in a photographic lineup. He was only 65 percent certain in his identification. However, at trial, A.P. identified Torales as the perpetrator. He was 100 percent sure in his identification in court.

## The Gang Evidence

Much of Huerta's testimony at Torales's first trial was repeated at his retrial. We therefore omit discussion of much of the gang evidence.

## The Gang Expert's Testimony

Huerta opined that Torales was a documented Norteño gang member from the specific neighborhood of VFC. Based upon a hypothetical mirroring the facts of the instant case, Huerta opined the charged crimes were committed for the benefit of the gang. He explained, one of the primary activities of the gang is robbery, which would benefit the perpetrator personally as well as the gang because the perpetrator would be required to pay taxes to the gang.

12.

Huerta explained, "[i]f you have a Norteño gang member making money for the gang, that benefits the gang. And in association with the gang, it also boosts their reputation throughout the gang. So if they are committing the robbery and paying some of the money, but now throughout the gang people know that that gang member is down to commit crimes for the gang, someone that can be trusted, and then it furthers their career somewhat in the gang." "The money coming to the gang will promote the gang to be used to purchase firearms and/or narcotics or anything that benefits the gang."

## ANALYSIS

I.    **Evidence Supporting the Organizational Connection Between VFC and the Overarching Norteño Street Gang**

Torales contends there is insufficient evidence to establish an associational or organizational connection between VFC, the subset to which he belonged, and the broader Norteño street gang for whom he acted to benefit. We disagree.

A.    **Background: The Gang Evidence**

*The First Trial*[4]

Based upon the evidence adduced at trial, including Torales's prior contacts with police, gang-related tattoos, his jail housing classification, and his self-admissions, Huerta opined that Torales was a Norteño with the VFC subset. Huerta explained that within the hierarchy of the Norteño gang, VFC is another neighborhood in the County of Tulare. Tulare County is dominated by the Norteños, and VFC is primarily located in Farmersville.

According to Huerta, the primary activities of the VFC Norteños include: narcotics sales, drive-by shootings, assaults with deadly weapons, and robberies. The prosecutor adduced evidence of two predicate offenses to establish the gang's members

---

**4**     We recite the facts from Torales's trial and his retrial separately because Torales's brief observes that the evidence adduced at each respective trial is similar but was not identical.

13.

have engaged in "a pattern of criminal gang activity" as defined by former section 186.22, subdivision (e).

On March 12, 2008, Torales, along with another adult and a juvenile, assaulted and robbed J.H. after Torales demanded J.H. pay "taxes." The other adult who participated in the crime was Carina Corona, who had multiple gang-related tattoos, including, "VFC" on her ankle, a dot on her right hand, and "X4" on her left hand.

On December 30, 2007, Luis Moreno and Stephen Castro were arrested for assaulting a rival Sureño gang member in Farmersville. Moreno and Castro were convicted of assault with a deadly weapon and robbery with a gang enhancement after calling the victim a "scrap" and then beating him with brass knuckles and assaulting him with a knife. Huerta explained that a "scrap" is a derogatory term used by Norteños, and that he had never heard somebody use that term outside of the Norteño gang context.

As to the gang enhancements, Huerta opined that robberies similar to those committed by Torales would benefit "the gang" both financially and reputationally. Huerta testified about a wiretap he had recently participated in with the Department of Justice. During the timeframe in which Torales's robberies occurred, there was a standing order in effect for all members of the gang in Tulare County to generate money for the gang. This order was given by Pistol Pete, the regional commander of the Norteños in charge of Tulare County. The gang's members were also told not to wear identifiable clothing during crimes and to conceal their gang identity.

Huerta explained that proceeds from the robberies would have to be turned over to the gang because every Norteño on the street was required to pay taxes. This requirement was enforced by hit squads. Taxes were ordinarily channeled back up through the hierarchy of the gang, to the Nuestra Familia. Unbeknownst to the gang's members, Pistol Pete was embezzling money from the gang.

The prosecutor also adduced circumstantial evidence showing Torales, a self-admitted member of VFC and the overarching Norteño street gang, was being taxed. On

14.

the night Torales was arrested and booked into jail, he made a phone call while he was in a pretrial detention facility. During the phone call, Torales told a third party to, "try to find out – get at my old lady, find out of [*sic*] she … if the homey's … sent a squad," "[c]ause that was the whole reason why I went to go … to Farmersville to go get thing (inaudible) come up for them."

Based upon his knowledge and experience, Officer Huerta opined Torales was concerned about a hit squad coming to his house because he owed the gang taxes from the robberies or from a preexisting unpaid debt. Huerta maintained that all Norteños pay taxes to the gang.

### The Retrial

As in Torales's first trial, Huerta opined that the robberies would benefit Torales and the gang both reputationally and financially. Based upon a hypothetical mirroring the facts of the instant case, Huerta explained that if a gang member was concerned about whether a hit squad had been by their home, they were either indebted to the gang or they were being taxed on the proceeds from the robberies.

Huerta added, "VFC is a subset of the Norteños in Tulare County. So if you are a Norteño and you're committing crimes, money is getting filtered. That's the way it works." Huerta explained this practice was particularly relevant at the time the robberies occurred because of the standing order issued by Pistol Pete, and Torales's recorded jail phone call. According to Huerta, taxes paid by the gang's members could be used by the gang to purchase firearms or narcotics.

### B. The Sameness Requirement

When a reviewing court considers a claim that the evidence is insufficient to support a verdict, it considers the entire record in the light most favorable to the prosecution and presumes in support of the verdict the existence of every fact the jury could reasonably have deduced from the evidence. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.) "We apply a deferential standard of review when evaluating ...

15.

whether the evidence in this case was sufficient to satisfy the [Street Terrorism Enforcement and Prevention] Act's definition." (*People v. Prunty* (2015) 62 Cal.4th 59, 71 (*Prunty*).) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

To establish the existence of a criminal street gang under the Street Terrorism Enforcement and Protection Act, also known as the STEP Act (former § 186.20 et seq.), "the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) The prosecution may rely on expert testimony to prove the elements of the gang enhancement. (*People v. Garcia* (2017) 9 Cal.App.5th 364, 375-376.)

Torales challenges the sufficiency of the evidence supporting the third element, the pattern of criminal gang activity. A "pattern of criminal gang activity" is defined as the "commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" specifically enumerated offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (former § 186.22, subd. (e).)

In *Prunty*, our Supreme Court held that the STEP Act requires the prosecution to adduce evidence "show[ing] that it is the same 'group' that meets the definition of section

186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22(b)." (*Prunty, supra*, 62 Cal.4th at p. 72, fn. omitted.) "This 'sameness' requirement means that the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." (*Id.* at p. 81.) Consequently, "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Id.* at pp. 67-68.)

There are multiple ways to satisfy the sameness requirement, depending on the circumstances of the case. First, the prosecution can establish that the defendant sought to benefit an umbrella or subset gang, and members of the same umbrella or subset gang also committed the requisite predicate offenses/primary activities. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 49-50; see also *People v. Ewing* (2016) 244 Cal.App.4th 359, 372-373.) Alternatively, the prosecution can introduce evidence the defendant sought to benefit an umbrella gang, plus evidence that another gang/subset committed the predicate offenses/primary activities, plus evidence showing a sufficient associational connection between the umbrella gang and the other gang/subset." (*Prunty, supra*, 62 Cal.4th at p. 82.) Whatever the prosecution's theory of the case, the evidence must be sufficient to permit the jury to conclude that the group the defendant sought to benefit under section 186.22, subdivision (f), is the same group that "committed the predicate offenses and engaged in criminal primary activities." (*Prunty*, at p. 72.)

### A. Analysis

#### *The First Trial*

Huerta opined that Torales was an active Norteño gang member from the VFC neighborhood, and that the charged crimes would benefit "the gang" and the perpetrators

17.

financially and reputationally. According to Huerta, the primary activities of VFC include: narcotics sales, drive-by shootings, assault with deadly weapons, and robbery. To establish the gang's pattern of criminal gang activity, the prosecutor adduced evidence of Torales's 2008 conviction for assault and robbery, and Castro and Moreno's 2007 conviction for assault with a deadly weapon and robbery. Thus, the gang the prosecutor endeavored to prove existed was VFC.

Throughout Torales's first trial and his retrial, the parties referred to the relevant criminal street gang as "VFC" and "the Norteños" interchangeably. Because of this, it is not clear which criminal street gang—VFC or the larger Norteño gang—Torales had purportedly acted to benefit. Assuming Torales acted for the benefit of VFC, *Prunty* would not be implicated. The group he would have acted to benefit under section 186.22, subdivision (f), would have been the same group that "committed the predicate offenses and engaged in criminal primary activities." (*Prunty, supra*, 62 Cal.4th at p. 72.) Alternatively, assuming Torales had acted for the benefit of the overarching Norteño street gang, the prosecutor was required to meet *Prunty's* " 'sameness' requirement." (*Id.* at p. 81.)

As the record is unclear, we will assume for the sake of argument that the jury understood the prosecutor's theory of the case to be that Torales had acted for the benefit of the overarching Norteño street gang rather than VFC. To this end, we conclude the prosecutor's factual showing was sufficient under *Prunty* to establish a connection between VFC and the Norteño street gang.

Here, the prosecutor adduced evidence showing that all Norteños are required to pay taxes to the gang, which would be filtered up through the hierarchy of the larger gang to the Nuestra Familia. This requirement was enforced by hit squads. Moreover, during the timeframe in which the robberies were committed, the regional commander in charge of the Tulare County Norteños ordered members of the gang to commit crimes, such as

18.

robbery, to bring in money for the gang. All Norteño subsets within Tulare County were required to contribute.

The prosecutor also adduced evidence showing that Torales, a self-admitted member of VFC, who had also identified as a Norteño, was being taxed or expected to be taxed. Following his arrest, Torales made a recorded phone call from jail to a third person inquiring whether a hit squad had been sent to his house. During the phone call, Huerta opined Torales made statements indicating he was either being taxed by the gang on proceeds from the robberies, or that he owed money to the gang from a prior debt.

Contrary to Torales's assertions, this evidence was sufficient to establish the necessary organizational connection required by *Prunty*. From this evidence, the jury could reasonably conclude VFC and the larger Norteño street gang share a common identity because Torales, like all Norteños within Tulare County, was expected to contribute financially to the gang.

Moreover, unlike *Prunty*, there was evidence showing that Torales self-identified as a member of VFC and as a member of the larger Norteño criminal street gang. One of Torales's prior convictions was used as one of the predicate offenses establishing the gang's pattern of criminal gang activity. In contrast, the prosecutor in *Prunty* failed to present any evidence showing that members of the two neighborhood subsets whose members committed the predicate offenses self-identified as part of the larger Norteño gang. (*Prunty*, *supra*, 62 Cal.4th at pp. 82-83.)

Further, both Torales and one of his criminal associates, Corina Corona, had tattoos specific to both VFC and the Norteños. Torales has the word "Norte" tattooed on the back of his head. Huerta explained that if a non-Norteño displayed a similar tattoo, they could be beaten or killed. The presence of VFC and Norteño tattoos on both Torales and Corona further supports the conclusion that VFC and the overarching Norteño street gang share a common identity. (*People v. Garcia*, *supra*, 9 Cal.App.5th at p. 379 [the

19.

defendant's tattoos of both the overarching gang's name and his subset was a "corporeal representation of the association between the gang and one of its subsets"].)

In sum, this evidence was sufficient to support an organizational connection between the overarching Norteños, for whom Torales had ostensibly acted to benefit, and the VFC subset which the prosecutor endeavored to prove had existed.

***The Retrial***

As the evidence adduced at Torales's retrial was similar to the evidence adduced at this first trial, we conclude it too was sufficient to meet the sameness requirement of *Prunty*. Based upon Huerta's testimony that all Norteño subsets in the County of Tulare were operating under a directive to bring in money for the gang, Torales's self-identification as a member of VFC and the larger Norteño gang, his statements expressing concern about a hit squad coming by his home, and the fact that he owed money to the gang or had expected to be taxed, the jury could reasonably infer that VFC is organizationally connected to the Norteño street gang.

## II. Sufficiency of the Evidence Supporting the Gang Enhancement

Next, Torales attacks the sufficiency of the evidence supporting the gang enhancements. While thin, we conclude the evidence presented at both trials was sufficient to support the gang enhancements based upon the law as it stood at the time of Torales's trials.

### A. Background

The facts supporting the criminal street gang enhancement were recited in part I, *ante*, we therefore do not repeat them here.

### B. Relevant Legal Principles

On appeal, the court must view the evidence in the light most favorable to the judgment below, indulging in all presumptions and every logical inference the trier of fact could draw from the evidence. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156; *People v. Maury* (2003) 30 Cal.4th 342, 396.) The test is whether substantial evidence

20.

supports the jury's conclusion (*People v. Johnson* (1980) 26 Cal.3d 557, 576-578), not whether the reviewing court would reach the same conclusion. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.)

Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) " 'The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable.' " (*People v. Panah* (2005) 35 Cal.4th 395, 489; *People v. Scott* (1978) 21 Cal.3d 284, 296.)

If the verdict is supported by substantial evidence, the appellate court must accord due deference to the trier of fact and not substitute their evaluations of a witness's credibility for that of the fact finder. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) Because an appellate court must "give due deference to the trier of fact and not retry the case ourselves," an appellant challenging the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

The gang enhancements required proof Torales committed the underlying offenses (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1), (4).) Torales contends the evidence was insufficient to meet the second prong of the enhancement.

**C.     Analysis**

At both trials, Huerta opined that Torales's crimes would benefit Torales and the gang reputationally and financially. Following his arrest, Torales made the following statements in a recorded jail phone call: "[T]ry to find out—get at my old lady, find out… if the homey's … sent a squad." "Cause that was the whole reason why I went to go … to Farmersville to get a thing (inaudible) *to come up for them*." Huerta opined that one possible motivation for the robberies was that the perpetrator needed money to pay

21.

their taxes.  Based upon his knowledge of common vernacular used by the Norteños, Huerta explained that Torales's statements meant he was being taxed by the gang, or that he owed a preexisting debt to the gang and the hit squad was coming to collect.

Huerta explained that subsets of the Norteños are responsible for paying taxes to the Nuestra Familia and its leaders, based upon the hierarchy of the gang.  And, at the time of the robberies, there was a standing order by the regional commander in charge of the Tulare County Norteños for all members to commit crimes, such as robberies, to bring in money for the gang.

From Torales's statements and Huerta's explanation of the significance thereof, as well as the directive in place at the time of the robberies, the jury could conclude the robberies were committed for the benefit of the Norteños, with the " 'the specific intent … 'to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Hill* (2006) 142 Cal.App.4th 770, 774, italics omitted.)  The jury could reach this conclusion even assuming Torales never subsequently turned over proceeds from the robberies to the gang.  Application of the gang enhancement does not require the perpetrator's originally intended motivation for the underlying crime to have been accomplished.  Contrary to Torales's assertion, there was nonspeculative, circumstantial evidence adduced at trial supporting the conclusion that Torales had acted for the benefit of the overarching Norteño street gang.

We acknowledge the jury could also have reached an alternative conclusion:  that the robberies were committed for Torales's own financial benefit, and that Torales only claimed he had acted "to come up [for the gang]" after his crimes were presumably discovered by the gang following his arrest.  This theory would unquestionably fail to support the conclusion that the robberies were committed for the benefit of the gang.[5]

---

[5] Torales contends the gang expert's testimony permitted the jury to conclude the gang enhancement could be found true assuming the robberies were committed for Torales's own financial benefit because he would eventually be forced to pay taxes to the

However, "it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.) Thus, "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

## III.    Assembly Bill No. 333 Retroactively Applies

On October 8, 2021, the Governor signed Assembly Bill No. 333 into law, amending the Street Terrorism Enforcement and Prevention Act. In supplemental briefing, Torales argues that the criminal street gang enhancements must be reversed as a result of changes made to the law following the enactment of Assembly Bill No. 333. (See Stats. 2021, ch. 699, §§ 1-5.) The People concede Torales is entitled to relief, but argue the prosecutor is entitled to retry the enhancement allegations, if he elects to do so.

We conclude the gang enhancements (§ 186.22, subd. (b)), as well as the gun use enhancements that specifically refer to section 186.22 (§ 12022.53, subds. (b) & (e)(1)), must be vacated. We further conclude the People are entitled to retry these allegations on remand, should they elect to do so.

### A.  Assembly Bill No. 333

Assembly Bill No. 333 was signed into law at a regular session of the Legislature and therefore went into effect on January 1, 2022. (Cal. Const., art. IV, § 8; Gov. Code, § 9600, subd. (a); *People v. Camba* (1996) 50 Cal.App.4th 857, 865 [" ' "Under the California Constitution, a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment except where the statute is passed as an urgency measure and becomes effective sooner." ' "].)

---

gang. However, the prosecutor's theory in closing argument clarified that between Pistol Pete's directive and Torales's recorded jail phone call, Torales had acted with the intent to benefit the gang, presumably operating under the directive issued by Pistol Pete.

23.

Assembly Bill No. 333, the STEP Forward Act of 2021 (the STEP Forward Act), amends the Street Terrorism Enforcement and Prevention (STEP) Act (former § 186.22 et seq.) in multiple aspects. Our analysis of several of the substantive changes relevant to Torales's conviction is fully detailed below. However, to summarize, the STEP Forward Act amends the STEP Act in the following respects.

First, the STEP Forward Act amends the definition of a "criminal street gang," requiring proof that the gang is an *organized* association, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f)). Second, it amends the definition of what constitutes a "pattern of criminal gang activity" by requiring the last offense to have occurred within three years of the date the current offense is alleged to have occurred. (§ 186.22, subd. (e)). Third, it narrows the list of crimes that may be used to establish a pattern of criminal gang activity (compare former § 186.22, subd. (e)(1)-(33), with § 186.22, subd. (e)(1)(A)-(Z)). Fourth, it prohibits use of the currently charged offense to establish a pattern of criminal gang activity (*id.*, subd. (e)(2)). Fifth, it defines "to benefit, promote, further, or assist" as used throughout section 186.22 to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational." (*Id.*, subd. (g).) And finally, the STEP Forward Act adds section 1109 to the Penal Code, requiring bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) Section 1109 also requires the substantive offense of active participation in a criminal street gang (186.22, subd. (a)) to be tried separately from all other counts that do not require gang evidence as an element of the crime.[6]

---

[6] Section 1109 is not at issue in the current case. Consequently, we do not address it. We emphasize that our conclusion in part II.B, *post*, that Assembly Bill No. 333's amendments to section 186.22 apply retroactively to all nonfinal convictions should not

24.

### 1.  The Amended Definition of a "Criminal Street Gang"

Under former section 186.22, subdivision (f), a "criminal street gang" was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."

Assembly Bill No. 333 redefined "a criminal street gang" to mean "*an ongoing, organized association* or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and *whose members collectively engage in, or have engaged in, a pattern of criminal gang activity.*"  (§ 186.22, subd. (f), italics added.)

As can be seen, section 186.22 now requires the prosecution to adduce evidence showing the gang is an "organized association" and that the gang's members have "collectively" engaged in a pattern of criminal gang activity.  Thus, evidence that a member of a particular gang, acting alone, has committed a qualifying offense under amended section 186.22 subdivision (e)(1)(A) through (Z) will not suffice to prove "collective" engagement in a pattern of criminal gang activity.  (See *People v. Lopez* (2021) 73 Cal.App.5th 327.)

### 2.  The Amended Definition of a "Pattern of Criminal Gang Activity"

A "pattern of criminal gang activity" was previously defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile

---

be construed to mean that we further conclude section 1109 is retroactive.  Nor do the People concede as much.

petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (former § 186.22, subd. (e).) "[T]he offenses comprising a pattern of criminal gang activity are referred to as predicate offenses." (*People v. Valencia* (2021) 11 Cal.5th 818, 829.)

Following the enactment of Assembly Bill No. 333, the definition of a "pattern of criminal activity" has been amended as follows: a " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses [§ 186.22, subd. (e)(1)(A)-(Z)], provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense *and within three years of the date the current offense is alleged to have been committed*, the offenses were committed on separate occasions or by two or more *members [of the gang]*, *the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational*." (§ 186.22, subd. (e)(1), italics added.)

To prove the "pattern of criminal gang activity," the prosecution must now adduce evidence showing: (1) the last predicate offense occurred within three years of the currently charged offense; (2) the predicate offenses were committed by members of the gang who acted collectively; and (3) the offenses commonly benefit a criminal street gang, and that benefit is more than reputational. Subdivision (g) of section 186.22 provides the following examples of a common benefit that is more than reputational: "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." By contrast, evidence of a reputational benefit would include an expert's opinion that the commission of a particular violent crime would elevate a gang member's reputation,

which inures to the gang's benefit by instilling fear into the community and rival gang members.  (See, e.g., *People v. Albillar* (2010) 51 Cal.4th 47, 63.)

Our Supreme Court had previously held that the current offense could be used to prove the existence of a pattern of criminal gang activity.  (*People v. Gardeley, supra,* 14 Cal.4th 605, 625, disapproved on another ground by *People v. Sanchez*, *supra*, 63 Cal.4th 665, 686, fn. 13; accord, *People v. Loeun* (1997) 17 Cal.4th 1, 10.)  Assembly Bill No. 333 expressly prohibits use of the currently charged offense to prove the pattern of criminal gang activity.  (§ 186.22, subd. (e)(2).)

Additionally, seven offenses were removed from the list of crimes that may qualify as those supporting a pattern of criminal gang activity, including:  looting (§ 463); felony vandalism (§ 594, subd. (b)(1)); felony theft of access card or account information (§ 484e); counterfeiting, designing, using or attempting to use an access card (§ 484f); felony fraudulent use of access card or account information (§ 484g); unlawful use of personal identifying information to obtain credit, goods, services, or medical information (§ 530.5); and wrongfully obtaining Department of Motor Vehicles documentation (§ 529.7).

### B.  Assembly Bill No. 333 Retroactivity Applies to Torales's Nonfinal Judgment of Conviction

"Generally, statutes are presumed to apply only prospectively.  [Citation.] However, this presumption is a canon of statutory interpretation rather than a constitutional mandate.  [Citation.]  Accordingly, 'the Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication.'  [Citation.]  Courts look to the Legislature's intent in order to determine if a law is meant to apply retroactively." (*People v. Frahs* (2020) 9 Cal.5th 618, 627.)

"When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are

27.

not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted (*Brown*), citing *In re Estrada* (1965) 63 Cal.2d 740, 742-748 (*Estrada*).) In *Brown,* our Supreme Court explained that *Estrada* "articulate[d] the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown*, at p. 324; accord, *People v. Conley* (2016) 63 Cal.4th 646, 656 (*Conley*).)

Estrada's rationale is based on the principle that, " '[o]rdinarily, when an amendment lessens the punishment for a crime, one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest.' " (*People v. Nasalga* (1996) 12 Cal.4th 784, 791 (plur. opn. of Werdegar, J.) (*Nasalga*).) As *Estrada* explained: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.... [T]o hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at p. 745; see *Conley*, *supra*, 63 Cal.4th at p. 656 ["when the Legislature determines that a lesser punishment suffices for a criminal act, there is ordinarily no reason to continue imposing the more severe penalty, beyond simply ' "satisfy[ing] a desire for vengeance" ' "].)

In sum, "*Estrada* stands for the proposition that, 'where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.' " (*Nasalga*, *supra*, 12 Cal.4th at p. 792; accord, *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)

The People concede that *Estrada's* presumption of retroactivity applies here. Although Assembly Bill No. 333 does not guarantee a reduced punishment, it increases the evidentiary showing required for a conviction upon the substantive gang offense and the penalty enhancement. *Estrada* has been applied to statutes governing penalty enhancements under analogous circumstances. (*Nasalga, supra*, 12 Cal.4th at p. 792 ["[t]he rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses"]; (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 [amendments to death penalty circumstances applied retroactively to defendants whose crimes were committed before the change if their conviction was not yet final]; *People v. Millan* (2018) 20 Cal.App.5th 450, 455-456 [amendment removing defendant's prior convictions from list of convictions qualifying for imposition of enhancement under Health & Saf. Code, § 11370.2, subd. (c) applied retroactively]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 69-71 [amendment adding requirements for imposition of drug trafficking enhancement applied retroactively].)

To rebut *Estrada's* inference of retroactivity, the Legislature must clearly signal "its intent to make the amendment prospective, by the inclusion of either an express saving[s] clause or its equivalent." (*Nasalga*, *supra*, 12 Cal.4th at p. 793.) Neither the text nor the legislative history of amended section 186.22 clearly indicate that the Legislature intended that the *Estrada* rule would not apply. We therefore accept the People's concession.

### C. Analysis

Torales's case did not reach finality by January 1, 2022, the date Assembly Bill No. 333 went into effect. (*People v. Smith* (2015) 234 Cal.App.4th 1460, 1465 ["[a] judgment becomes final when the availability of an appeal and the time for filing a petition for certiorari [with the United States Supreme Court] have expired"].) The People concede that as a result of changes made to the law following the enactment of Assembly Bill No. 333, Torales is entitled to reversal of the gang enhancements applied

29.

to his sentence.  We agree.  There is insufficient evidence upon this record to support the enhancements under amended section 186.22.

At the time of Torales's trial and his retrial, the prosecutor adduced sufficient evidence to prove the existence of the gang and that Torales's crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang.  Following the enactment of Assembly Bill 333, evidence supporting the gang's pattern of criminal activity falls short in several respects.  We do not recite an exhaustive list of every manner in which the evidence is now insufficient, as one shortcoming alone compels us to vacate the enhancements that are based upon section 186.22.

The crimes used to establish the predicate offenses occurred in 2007 and 2008, more than three years before the charged robberies occurred.  (See § 186.22, subd. (e)(1) [a " 'pattern of criminal gang activity' " requires two or more of the offenses enumerated within subdivision (e)(1)(A) through (Z), and "and the last of those offenses occurred within three years of the prior offense *and within three years of the date the current offense is alleged to have been committed*"].)  And, because the prosecution is now prohibited from relying upon the current conviction to supply the predicate offenses (see § 186.22, subd. (e)(2)), there is insufficient evidence to support the pattern of criminal gang activity required to prove the existence of a criminal street gang under the STEP Forward Act.

We conclude the existing record is insufficient to support the heightened evidentiary requirements set forth by amended section 186.22.  As a result, the gang enhancements (§ 186.22, subd. (b)) applied to Torales's sentence must be reversed, as well as the firearm enhancements for the use of a firearm by a principal (§ 12022.53, subds. (b) & (e)(1), counts 11, 12 and 14-19).  These firearm enhancements necessarily required the prosecution to prove Torales violated subdivision (b) of section 186.22.  (§ 12022.53, subd. (e)(1)(A).)

"Double jeopardy forbids retrial after a reversal due to insufficient evidence to support the verdict." (*In re D.N.* (2018) 19 Cal.App.5th 898, 902.) However, double jeopardy is not implicated when the prosecution makes its case under the law as it stood at trial. (*Ibid.*) "Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, … the reviewing court does not treat the issue as one of sufficiency of the evidence." (*People v. Figueroa*, *supra*, 20 Cal.App.4th at p. 72.) Here, because the prosecutor adduced sufficient evidence supporting the criminal street gang and section 12022.53, subdivision (e)(1) firearm enhancements based upon the law as it stood at the time of Torales's trials, the People are not foreclosed from retrying the enhancements upon remand.[7]

## IV.    CALCRIM No. 315

Next, Torales argues the trial court prejudicially erred by instructing the jury that it may consider the extent to which an eyewitness is certain or uncertain of their identification, pursuant to CALCRIM No. 315. According to Torales, this violated his right to federal due process. Counsel did not object to this instruction below.

The People concede that although defense counsel failed to object below, any objection would have been futile in light of then-existing law. However, the People contend Torales's claim of error is meritless.

We reject Torales's claim of prejudicial error based upon our Supreme Court's decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). In *Lemcke,* our Supreme Court held that based upon the record before it, the inclusion of the certainty factor in CALCRIM No. 315 had not violated the defendant's due process rights. (*Id.* at pp. 654-

---

[7]    Torales further contends case specific hearsay was used to establish one of the predicate offenses, and that the erroneous admission of this evidence compels reversal of the gang enhancements under *People v. Valencia* (2021) 11 Cal.5th 818 at page 829. In light of our conclusion that reversal of the gang enhancements is compelled by the enactment of Assembly Bill No. 333, we do not reach this argument.

661.) Guided by *Lemcke*, we conclude Torales's claim lacks merit based upon the record before us.

## A. Background: The Identifications

One week after the June 17, 2015 Valero gas station robbery, two men came into the store to purchase snacks. R.F. recognized one of the men as the perpetrator of the robbery. She recognized the man's distinctive dark eyes, his thick eyebrows, and the pock marks on his forehead. At trial, R.F. identified Torales as the perpetrator of the robbery. She was certain of her identification.

A.P. also identified Torales as the perpetrator of the June 19, 2015 robbery of the Chevron gas station. He stated that the perpetrator has "very distinguished" eyes. A.P. testified he was 100 percent certain of his identification.

At the conclusion of both trials, the jury was instructed pursuant to CALCRIM No. 315. This instruction sets forth 14 factors for the jury to consider in evaluating eyewitness identification testimony, including: "How certain was the witness when he or she made an identification?"

The jury was also instructed that "People … make mistakes about what they remember," and that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime." And, "[i]f the People have not met this burden, [the jury] must find the defendant not guilty."

## B. Relevant Legal Principles

In *Lemcke*, the prosecution's eyewitness identified the defendant as the perpetrator on three occasions, twice before trial in six-pack photographic lineups, and once at trial. (*Lemcke*, *supra*, 11 Cal.5th at pp. 648-650.) The eyewitness expressed certainty in her identifications. (*Id.* at pp. 649-650.) At trial, defense counsel vigorously attacked the identifications. (*Id.* at p. 660.) Defense counsel called an eyewitness identification expert witness who testified at length about the weak correlation between the certainty and accuracy of eyewitness identifications, particularly with respect to in-court

32.

identifications. (*Ibid*.) The defendant also cross-examined the eyewitness and the investigating officers who had conducted the photographic lineups. (*Id.* at pp. 650-652.)

In language virtually identical to CALCRIM No. 315, the trial court instructed the jury on 15 factors it should consider in evaluating the accuracy of an eyewitness's identification, including how certain the witness was when she made the identification. (*Lemcke*, *supra*, 11 Cal.5th at pp. 652, 654, fn. 5.) In closing argument, the prosecution focused on the eyewitness's testimony, arguing her consistent identification of the defendant was accurate, in part because of the eyewitness's unwavering certainty. (*Id.* at p. 652.)

The defendant was convicted, and the appellate court affirmed, concluding it was bound by *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*) and *People v. Johnson* (1992) 3 Cal.4th 1183, which had expressly approved the use of similarly worded instructions on witness certainty. (See *Sánchez*, at pp. 461-463; *Johnson*, at pp. 1231-1232.) In the California Supreme Court, Lemcke argued that the certainty factor as stated in the jury instructions had violated his due process rights by (1) lowering the prosecution's burden of proof, and (2) denying him a meaningful opportunity to present a complete defense on the issue of identity. (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) Our Supreme Court found both claims meritless. (*Id.* at pp. 654-661.)

With respect to Lemcke's claim that the certainty factor lowered the prosecution's burden of proof, the court observed, "[t]he instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed." (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) The court further observed that the jury had been instructed that (1) the jurors were responsible for judging the credibility of witnesses, who sometimes make honest mistakes about what they remember; (2) the defendant was presumed innocent; and (3) that in addition to proving the elements of the charged crimes, the prosecution

33.

was required to prove the defendant's identity as the perpetrator beyond a reasonable doubt.  (*Id.* at p. 658.)

As to Lemcke's claim that he was denied a meaningful opportunity to present a complete defense, the court observed that Lemcke "had the opportunity to cross-examine [the eyewitness] and the investigating officers regarding her identifications and the procedures used during the photographic lineups," and had "elicited numerous inconsistencies in other aspects of [her] recollection."  (*Lemcke*, *supra*, 11 Cal.5th at p. 660.)  The court concluded that the inclusion of the certainty factor in the eyewitness-identification instruction had not rendered the trial fundamentally unfair.  (*Id.* at pp. 646, 661.)  However, the court instructed trial courts to omit the certainty language from CALCRIM No. 315 until the instruction is modified by the Judicial Council.  (*Id.* at p. 669.)

## C.    Analysis

Here, as in *Lemcke*, the juries in both trials were instructed pursuant to CALCRIM No. 315, which permitted the jury to consider, "[h]ow certain was the witness when he or she made an identification?"  However, we conclude that listing the witness's level of certainty as one of 14 factors the jury should consider when evaluating an eyewitness's identification did not render Torales's trials fundamentally unfair or otherwise amount to a due process violation.

Although the juries were instructed to consider the witness's certainty in making an identification, here, as in *Lemcke*, the jury was further instructed that (1) the prosecution had to prove Torales's guilt beyond a reasonable doubt; (2) Torales was entitled to a presumption of innocence; and (3) the jurors were responsible for judging the credibility of witnesses, who "sometimes honestly forget things or make mistakes about what they remember."

Considering the challenged portion of CALCRIM No. 315 " ' "in the context of the instructions as a whole and the trial record[]" ' " (*Lemcke, supra*, 11 Cal.5th at p. 655,

34.

citing *People v. Foster* (2010) 50 Cal.4th 1301, 1335), we find no due process violation for several reasons.

First, "the instruction does not direct the jury that ' "certainty equals accuracy." ' " (*Lemcke, supra*, 11 Cal.5th at p. 647.) Insofar as "the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy" (*id*. at p. 657), nothing foreclosed Torales from presenting his own eyewitness identification expert, who could have explained that certainty is not necessarily predicative of accuracy. Based upon the fact that he elected not to present such evidence, we presume the jury's consideration of the eyewitness's identifications in the context of CALCRIM No. 315, was simply not critical in light of other more compelling evidence the jury had to consider on the issue of identity.[8]

Second, defense counsel vigorously contested the accuracy of the eyewitness's identifications during his cross-examination of R.F. and A.P. He questioned R.F. and A.P. about lighting conditions at the store, the length of time they had to observe the perpetrator, and the fact that the perpetrator was wearing a face mask and hood. Nothing upon the record suggests Torales was denied the opportunity to present a complete defense. (*Lemcke, supra*, 11 Cal.5th at p. 660.)

Finally, the remainder of the instructions required the jury to find Torales not guilty if the People failed to meet their burden of proof beyond a reasonable doubt, and the instructions made clear that Torales was entitled to a presumption of innocence. Viewing the challenged portion of CALCRIM No. 315 in the context of these instructions, we are persuaded that the certainty language within CALCRIM No. 315 did not lower the prosecution's burden of proof. (*Lemcke, supra*, 11 Cal.5th at p. 658.)

---

[8]     Torales's crimes were recorded on surveillance video, which depicted some of his distinctive tattoos. Further, clothing identical to that worn by the perpetrator of the robberies was found in his possession following a search of his home.

Insofar as Torales contends the jury was permitted to return a guilty verdict based upon unreliable evidence, i.e., the eyewitness's confidence in their identifications, that claim is not supported by the record. An eyewitness's confidence in their identification was one factor among many the jury was given to consider on the issue of identity. And, as discussed, the jury was not instructed that certainty equals accuracy. The jury " 'remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible.' " (*Lemcke, supra*, 11 Cal.5th at p. 658.)

While our Supreme Court has recognized that eyewitness confidence is generally an unreliable indicator of accuracy, the jury's consideration of this factor does not invariably result in constitutional violation. (*Lemcke, supra*, 11 Cal.5th at p. 669.) Rather, the defendant must prove that a constitutional violation has occurred. (*Ibid*.) Upon this record, we are not persuaded Torales has met his burden.

## V. Insufficient Evidence Supports the Existence of Two Separate Conspiracies

Torales was convicted of conspiracy to commit assault with a deadly weapon and conspiracy to commit robbery. He argues there is insufficient evidence supporting the existence of two separate conspiracies. According to Torales, the record supports the inference that there was only one conspiracy—to commit robbery—and that his act of assault with a deadly weapon was merely a means of carrying out the robberies.

Relying upon the gang expert's testimony, the People contend there is evidence of two separate conspiracies. As we explain below, the People's argument is unpersuasive upon this record. The record supports the existence of only one conspiracy. We therefore reverse Torales's conviction for conspiracy to commit assault with a deadly weapon (§§ 182, subd. (a)(1), 245, subd. (b), count 20) for insufficient evidence.

### A. Background

Torales was charged with conspiracy to commit assault with a deadly weapon (§§ 182, subd. (a)(1), 245, subd. (b); count 20) on or between June 17, 2015 and July 2,

2015, and conspiracy to commit robbery (§§ 182, subd. (a)(1), 211; count 21) on or between June 17, 2015 and July 2, 2015. The trial court instructed the jury that to prove Torales was guilty of conspiracy to commit assault with a semi-automatic firearm and robbery, the People must prove the following:

1. Torales intended to and did agree with Estevan Gomez to commit assault with a firearm and robbery;

2. At the time of the agreement, Torales and the other alleged member of the conspiracy intended that one or more of them would commit assault with a semi-automatic firearm and robbery;

3. Torales, or Estevan Gomez, or both of them committed at least one of the following overt acts to accomplish assault with a semiautomatic firearm and robbery:  1. Obtained semiautomatic handgun; 2. With coconspirator, dressed in similar clothing: black hooded sweatshirt, jeans, face covering; 3. Attempted to conceal identity with face coverings; 4. Armed with semiautomatic handgun(s); 5. Entered business while armed, at or about, and between 12am and 4:30a.m.; 6. Pointed semi-automatic handguns at store employees; and 7. Demanded cash from register while gun pointed at store employee.

The jury found Torales guilty on both counts. At sentencing, the trial court stayed the sentence on both counts of conspiracy pursuant to section 654.

### B.    Relevant Legal Principles

When two or more persons agree to commit a number of criminal acts, the test of whether or not they have formed a single conspiracy is whether the acts were merely steps or stages in the formation of a larger and ultimately more general, all-inclusive conspiracy directed at achieving a single unlawful result. (*Blumenthal v. United States* (1947) 332 U.S. 539, 558-559.)  Alternatively, multiple conspiracies exist when the evidence adduced at trial demonstrates no interdependence among the participants and that there are separate agreements, each having a distinct, illegal objective that does not draw together to form a single, comprehensive plan. (*Id.* at pp. 556-560; *Kotteakos v.*

37.

*United States* (1946) 328 U.S. 750, 754-755; *People v. McLead* (1990) 225 Cal.App.3d 906, 920.)

"Relevant factors to consider in determining [whether there was a single conspiracy or multiple conspiracies] include whether the crimes involved the same motives, were to occur in the same time and place and by the same means." (*People v. McLead, supra,* 225 Cal.App.3d at p. 920.) "[W]here the evidence shows that a group of conspirators agreed to commit a number of different crimes incidental to a single objective, there is only one conspiracy, and convictions for multiple conspiracies cannot be sustained." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1133.)

### C. Analysis

Torales was charged with one count of conspiracy to commit robbery and one count of conspiracy to commit assault with a deadly weapon. The jury instructions referred to a single list of overt acts to support both counts. However, the evidence adduced at trial did not establish separate agreements to commit robbery and assault with a deadly weapon. The "ultimate purpose" of the agreement was to commit robbery, presumably for purposes of financial gain. The use of firearms were merely a means to accomplish that objective. Under the circumstances, " 'there is but a single conspiracy.' " (*People v. Lopez* (1994) 21 Cal.App.4th 1551, 1558.)

The People contend there is substantial evidence upon the record supporting the conclusion that Torales and Gomez conspired to commit robbery, with the goal of financially benefitting themselves and the Noreteño gang, and that they separately conspired to commit assault with a deadly weapon. The People specifically direct this court to Huerta's testimony that by using a firearm to commit the robbery, the perpetrator would gain notoriety within the gang, and it would bolster the gang's reputation for violence. In context, it appears the People suggest that Torales's and Gomez's motivation for committing multiple acts of assault with a deadly weapon was ultimately

38.

to gain notoriety within the gang, whereas their motivation for committing the robberies was financial gain.

The People's assertion that two separate conspiracies were formed, one for financial motive, and the second, to bolster the perpetrators' reputation for violence, is purely speculative. Gomez was not shown to claim membership to any specific gang. So it is unclear why he would conspire to commit assault with a deadly weapon with the goal of bolstering his reputation for violence. Moreover, neither Torales nor Gomez wore obvious gang clothing, used gang slurs, or displayed gang signs during the commission of the robberies. Under the circumstances, we are unable to conclude that the assaults were perpetrated for any reason other than to accomplish the robberies.

The People further contend Torales's and Gomez's acts of assault with a deadly weapon upon the convenience store clerks was unnecessary to effectuate the robberies. We find their assertion unconvincing. By utilizing a firearm during the commission of the robberies, Torales and Gomez undoubtedly increased their chances of successfully completing their crimes.

We conclude Torales was erroneously convicted of two separate counts of conspiracy as charged in the amended information. We therefore reverse his conviction on count 20 for conspiracy to commit assault with a deadly weapon (§§ 182, subd. (a)(1), 245, subd. (b); count 20) for insufficient evidence. Based upon our conclusion, we do not address Torales's claim that the trial court erred by failing to instruct the jury that it must determine whether the conspiracies charged in counts 20 and 21 constituted a single conspiracy or multiple conspiracies.

## VI.    Senate Bill No. 136

Torales contends the prior prison term (§ 667.5, subd. (b)) enhancement applied to his sentence must be stricken following the enactment of Senate Bill No. 136. The

People concede Torales is entitled to relief.  We agree as well and will therefore strike the section 667.5, subdivision (b) enhancement applied to his sentence.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b) to limit the application of prior prison term enhancements to only prior prison terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b).  (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1.)  That amendment applies retroactively to all cases not yet final by Senate Bill No. 136's effective date.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342, citing *Estrada, supra,* 63 Cal.2d at p. 746.)

Here, the trial court imposed a one-year section 667.5, subdivision (b) prior prison term enhancement on count 11.  However, none of Torales's prior convictions qualify as sexually violent offenses within the meaning of Welfare and Institutions Code section 6600, subdivision (b).  Torales's prior prison term enhancement must therefore be stricken.

## VII.    Senate Bill No. 1393

Torales suffered a prior serious felony conviction (§ 667, subd. (a)(1)), which was used to enhance his prison sentence on count 11 by five years.  Effective January 1, 2019, Senate Bill No. 1393 amended sections 667, former subdivision (a)(1), and 1385, former subdivision (b), and vested trial courts with the discretion to strike or dismiss the previously mandatory five-year prior serious felony conviction enhancement under section 667, subdivision (a)(1).  (Stats. 2018, ch. 1013, §§ 1, 2.)  The changes effected by Senate Bill No. 1393 apply retroactively to all judgments not yet final on appeal.  (*People v. Ellis* (2019) 43 Cal.App.5th 925, 941.)

Torales was sentenced on November 5, 2018, after Senate Bill 1393 passed but before it took effect.  His prison sentence included a five-year enhancement for a prior serious felony conviction (§ 667, subd. (a)(1)).  As Torales's judgment of conviction had

not yet reached finality when Senate Bill 1393 became operative, the parties agree that he is entitled to resentencing under the new law. (*People v. Ellis, supra,* 43 Cal.App.5th at p. 941.)

We will therefore remand this case back to the lower court with directions for the court to determine whether to strike the five-year prior serious felony enhancement applied to Torales's sentence. We express no view as to how the trial court should exercise its discretion.

## VIII. Assembly Bill No. 518 and Senate Bill No. 567

During the pendency of this appeal, Governor Newsom signed two new laws into effect, Assembly Bill No. 518, which changes existing law regarding the trial court's discretion to stay a sentence under section 654 (Stats. 2022, ch. 441, § 1), and Senate Bill No. 567 (Stats. 2021, ch. 731), which amends section 1170. Both laws were signed into law at a regular session of the Legislature and therefore went into effect on January 1, 2022. (Cal. Const., art. IV, § 8; Gov. Code, § 9600, subd. (a); *People v. Camba, supra,* 50 Cal.App.4th 857, 865.)

We granted requests filed by Torales to submit supplemental briefing to consider the retroactive effect of these new laws, if any, upon his case. However, these issues are now moot in light of our conclusion that Torales is entitled to resentencing.

Our Supreme Court has held "that when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) This principle is called "the 'full sentencing rule.' " (*Id*. at p. 893.) In Part III, V, and VI, *ante*, we concluded some of the challenged enhancements and counts must be reversed. Consequently, Torales is entitled to a full resentencing hearing.

41.

Assembly Bill No. 518 and Senate Bill No. 567 went into effect on January 1, 2022. Thus, we need not address whether Torales is entitled to retroactive relief under Assembly Bill No. 518 and Senate Bill No. 567, as the laws apply prospectively to his judgment of conviction and must be considered at Torales's resentencing hearing.

## IX. Torales is Entitled to a Hearing on His Ability to Pay Court-Imposed Assessments

Relying upon *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Torales contends he is constitutionally entitled to a hearing on his ability to pay the fines, fees, and assessments imposed by the trial court at sentencing. The People respond that because the instant case must be remanded for resentencing, Torales should be afforded the opportunity to request an ability to pay hearing under the Eighth Amendment exclusively. As the instant case is being remanded for resentencing, we conclude Torales may raise his challenge to the fines, fees, and assessments under *Dueñas* or the Excessive Fines Clause of the federal and state Constitutions in the first instance below.

## DISPOSITION

The jury's true finding on the gang enhancements (§ 186.22, subd. (b)) and the firearm enhancements (§ 12022.53, subds. (b) & (e)(1)) are reversed. The matter is remanded back to the trial court for further proceedings. The People shall have 60 days from the date of the remittitur in which to file an election to retry Torales on these enhancements. If the People elect not to retry him, the trial court shall modify the judgment by striking the enhancements, and shall resentence Torales accordingly.

Torales's conviction for conspiracy to commit assault with a deadly weapon (§ 182, subd. (a)(1), 245, subd. (b)) is reversed for insufficient evidence. The one-year section 667.5 prior prison term enhancement is stricken.

At resentencing, the trial court is ordered to determine whether to exercise its discretion to strike the five-year prior serious felony conviction enhancement (§ 667,

subd. (a)(1)).  Torales shall have the opportunity to request a hearing on his inability to pay court-imposed fines and fees.

Following the conclusion of proceedings, the court shall amend the abstract of judgment in a manner consistent with this disposition and forward copies of the amended abstract to the appropriate law enforcement and custodial officials.  In all other respects, the judgment is affirmed.

SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DETJEN, J.